1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

INGOLF R. DINKLAGE,

11                            Plaintiff,

12              v.

13   HOLLAND AMERICA LINE-WESTOURS
     INC., HOLLAND AMERICA LINE NV, HAL
14   ANTILLEN NV, and STEINER-
     TRANSOCEAN, LTD.,

15                            Defendants.

CASE NO. C06-0018-JCC

ORDER

16

17          This matter comes before the Court on Defendants' Motion for Partial Summary Judgment (Dkt.

18   No. 22), asking that the Court limit Plaintiff's recovery to 46,666 Special Drawing Rights. Having

19   considered the parties' relevant submissions on the matter and determined that oral argument is

20   unnecessary, the Court hereby DENIES Defendants' motion.

21   I.      BACKGROUND AND FACTS

22          Plaintiff alleges that he was injured during the course of a cruise aboard the M/S Amsterdam

23   during January 2005 as a result of Defendants' negligence. (Amended Complaint 2-3 (Dkt. No. 14).)

24   Roughly two weeks prior to departure, he received a booklet of travel documents made up of 33 colored

25   8-inch by 3-inch stubs that included sections labeled "Arrival Advice," "Itinerary," "Contract (Please

26   ORDER – 1

1   Read)," and "Cancellation Information." (Dinklage Decl. 2 (Dkt. No. 26); Travel Documents 6 (Ex. 1 to

2   Dinklage Decl., Dkt. No. 26). At issue here is whether this Court should enforce a limitation of liability

3   clause contained in the Contract section of those documents.

4        Every other page of the Contract section is labeled "CONTRACT" in large lettering going down

5   the right-hand margin of the page. (*Id.* at 19-33.) The second page of the Contract section says

6   "IMPORTANT NOTICE TO PASSENGERS" in large, bold font. (*Id.* at 21.) The second paragraph

7   below this notice states: "NOTICE: YOUR ATTENTION IS ESPECIALLY DIRECTED TO

8   CLAUSES A.1, A.3, A.4, A.5, A.6, A.7, A.9, A.10, and C.4 BELOW, WHICH CONTAIN

9   IMPORTANT LIMITATIONS ON YOUR RIGHT TO ASSERT CLAIMS AGAINST US AND

10  CERTAIN THIRD PARTIES." (*Id.*) On the next page above the title "A. GENERAL PROVISIONS,"

11  the Contract states: "IMPORTANT TERMS AND CONDITIONS OF CONTRACT - READ

12  CAREFULLY BEFORE ACCEPTING." (*Id.*)

13       Paragraph A.14 of the Contract section contains the following provision in 8-point font.

14       14. **Governing Law; Transferability; Separability:** This contract is issued at Seattle,
         Washington. As to any cruise that does not begin, end or call at a port in the United States
15       of America, we shall be entitled to any and all damages limitations, immunities and rights
         applicable to us under the "Convention Relating to the Carriage of Passengers and Their
16       Luggage by Sea" of 1976 ("Athens Convention") which limits our liability for death of or
         personal injury to a passenger to no more than 46,666 Special Drawing Rights (as defined
17       therein), and all other limits for damage or loss to personal property. Otherwise, this
         contract and its interpretation shall, to the maximum extent allowed under the general
18       maritime law of the United States, be governed by and construed in accordance with the
         general maritime law of the United States, to the extent such maritime law is not
19       applicable, it shall be governed by and construed in accordance with the laws of the State
         of Washington (U.S.A.). This contract cannot be transferred by you. Any additions,
20       deletions or other alterations to, or waivers of any term of, this contract which are
         purported to have been made by us and which have not been agreed to in writing by the
21       President of HAL will not be legally binding upon us. Any provision of this contract which
         is prohibited or unenforceable in any jurisdiction will, as to such jurisdiction, be ineffective
22       to the extent of such prohibition or unenforceability and the validity and enforceability of
         the remaining terms and conditions of this contract will not otherwise be affected, nor will
23       the validity and enforceability of such provision be affected in any other jurisdiction.

24  (*Id.* at 29.)

25  //

26  ORDER – 2

## II.    STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure states that a party is entitled to summary judgment in its favor "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The moving party bears the burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is in fact a genuine issue for trial. *Anderson*, 477 U.S. at 250.

## III.    ANALYSIS

Plaintiff alleges that any limitation of liability to 46,666 Special Drawing Rights is unenforceable because it was not reasonably communicated. Cruise line passage contracts are governed by general federal maritime law. *Wallis v. Princess Cruises, Inc.*, 306 F.3d 827, 834 (9th Cir. 2002). The Ninth Circuit requires that fine-print limitations contained in passenger tickets be reasonably communicated to be enforceable, and uses a two-part test to determine whether this standard has been met. *Id.* at 835. The issue of whether such communication was reasonable is a question of law, to be determined by the Court. *Id*; *Deiro v. American Airlines, Inc.*, 816 F.2d 1360, 1364 (9th Cir. 1987). The first part of the analysis examines the physical characteristics of the ticket and the second part looks to the circumstances surrounding its purchase and retention. *Wallis*, 306 F.3d at 836.

ORDER – 3

a.      **Physical Characteristics**

The first (psychical characteristic) prong of the analysis requires that the Court "assess features such as size of type, conspicuousness and clarity of notice on the face of the ticket, and the ease with which a passenger can read the provisions in question." *Id.* at 835-36 (internal citations and quotations omitted). In *Wallis*, for example, the Ninth Circuit confronted a limitation of liability provision similar to the one at issue in this case, which purported to limit Princess Cruise Line's liability to the amount of Special Drawing Rights defined in the Convention Relating to the Carriage of Passengers and Their Luggage by Sea of 1976 ("Athens Convention"). *Id.* at 830. In this first part of the analysis, it held that the physical characteristics of the ticket sufficiently warned passengers of this limitation of liability. The Ninth Circuit wrote:

> The reference to the Athens Convention liability limitation is buried six sentences into paragraph 16 in extremely small (1/16 inch) type. However, paragraph 16 is legible, and it carries the heading: "16. LIMITATIONS ON CARRIER'S LIABILITY; INDEMNIFICATION." The "IMPORTANT NOTICE" warning headline reminds the passenger at least five times to read "SECTIONS 15 THROUGH 18." The pages upon which paragraph 16 is printed are marked with the words, "PASSAGE CONTRACT," in the upper right hand corner.

*Id.* at 836. Like the ticket in *Wallis*, the relevant Contract term at issue here is printed on passenger tickets in relatively small—but legible—font and is buried several sentences into the relevant clause in a section clearly labeled as "CONTRACT." Thus, these features favor a finding that the limitation was reasonably communicated.

Unlike the ticket in *Wallis*, however, the passenger's attention was not once directed specifically to the relevant paragraph (let alone five times) by any other portion of the contract. This omission is especially glaring because the carrier highlighted several other paragraphs, stating "NOTICE: YOUR ATTENTION IS ESPECIALLY DIRECTED TO CLAUSES A.1, A.3, A.4, A.5, A.6, A.7, A.9, A.10, and C.4 BELOW, WHICH CONTAIN IMPORTANT LIMITATIONS ON YOUR RIGHT TO ASSERT CLAIMS AGAINST US AND CERTAIN THIRD PARTIES." (Travel Documents 24.) There are only fourteen numbered paragraphs in the "General Provisions" (Section "A") of the Contract. That Paragraph

ORDER – 4

A.14 was not one of those flagged sections further underscores the significance of the carrier's failure to mention this provision as "an important limitation" on passengers' rights.

Further distinguishing the notice in case from that in *Wallis*, is the heading of the relevant paragraph. Here, Paragraph A.14 contains no reference to words such as "limitation," "liability," or similar limiting terms, but rather is contained under a section titled "**Governing Law; Transferability; Separability**." (Contract ¶ A.14.) This language stands in stark contrast to the heading in *Wallis*, 306 F.3d at 836 ("LIMITATIONS ON CARRIER'S LIABILITY; INDEMNIFICATION") and the other paragraphs in the contract that this carrier sought fit to highlight (*see* Contract ¶ A.3 ("**Time Limits for Noticing Claims and Filing and Service of Lawsuits**"); Contract ¶ A.4 ("**Limitation on Liability/Non-HAL Services**"); Contract ¶ C.4 ("**Liability and Relationship with Airlines**")). As this Court can see no way in which the carrier's reference to the Athens Convention involves "Severability" or "Transferability," it is left to infer that the liability provision is listed under this heading as a statement of "Governing Law" because the limitation mirrors that contained in the "law" of the Athens Convention. Yet this categorization is inappropriate here, where it is undisputed that the Athens Convention could never be the governing law on its own accord because no relevant country to the dispute is a signatory to it. *See Wallis*, 306 F.3d at 837. Thus, what is labeled as "Governing Law" is merely a contract term that is incorporated by reference from what happens to be a legal document. Accordingly, this provision constrains the rights of the litigants in a way that other forum-selection clauses do not by grafting on to the substantive law of the chosen forum a cap on damages that is otherwise inapplicable to it. As a result, the physical placement of a limitation on liability under the confusing heading of "Governing Law" supports Plaintiff's argument that the monetary cap on damages was not reasonably communicated.

As, with the ticket in *Deiro*, the Court acknowledges "[t]he instant case falls between those cases in which notice on the face of the ticket is virtually nonexistent, and those in which the notice is clear and conspicuous." *Deiro*, 816 F.2d at 1364 (9th Cir. 1987) (internal quotations and alterations omitted). On balance, however, an examination of the totality of the physical characteristics in light of the standards

ORDER – 5

1   outlined in *Wallis* favors Plaintiff's interpretation that there was not adequate notice of the liability

2   limitation at issue here.

3       **b.    Surrounding Circumstances**

4       Also like *Deiro*, "[w]hat is a close case under the first part of our analysis, however, becomes

5   decidedly clear upon consideration of the [second prong of the analysis]." *Id.* at 1365. Here, the Court

6   must evaluate "the circumstances surrounding the passenger's purchase and subsequent retention of the

7   ticket/contract." *Wallis*, 306 F.3d at 836 (internal quotations omitted). In *Wallis*, the Ninth Circuit

8   examined a similar contract that likewise incorporated the terms of the Athens Convention by reference.

9   The carrier in *Wallis* notified the passenger that its liability was limited to the amount of damages

10  applicable to it under the Athens convention, though it did not spell out precisely what those limits were.

11  The Ninth Circuit found the contract failed the second prong of the analysis because the significant

12  amount of legal and financial sophistication customers would need in order to decipher the contract's

13  terms made it unlikely that a passenger would undertake the effort to become informed of his or her legal

14  rights. This Court can discern two primary extrinsic factors identified by the Ninth Circuit in *Wallis* that

15  justified a finding that the limitation on liability was not reasonably communicated, both of which apply to

16  this contact as well.

17      First, the Ninth Circuit faulted the *Wallis* contract for not specifying the limitation on liability. The

18  relevant provision of the *Wallis* contract stated:

19      Carrier shall be entitled to any and all liability limitations, immunities and rights applicable
        to it under the "Convention Relating to the Carriage of Passengers and Their Luggage by
20      Sea" of 1976 ("Athens Convention") which limits the Carrier's liability for death of or
        personal injury to a Passenger to no more than the applicable amount of Special Drawing
21      Rights as defined therein, and all other limits for damage or loss of personal property.

22  (*Id.* at 830.) The Ninth Circuit held that a typical passenger who wanted to understand what this language

23  meant would have to (i) look up the Athens Convention; (ii) research its amendments, (iii) find the stated

24  liability limitation of "46,666 units of account per carriage," (iv) cross reference another section of the

25  Convention to learn that a "'Unit of Account' is the same as a 'Special Drawing Right as defined by the

26  ORDER – 6

International Monetary Fund,'" and (v) check a financial source to convert that unit into a currency valuation he or she could understand, calculated on the expected date of judgment. *Wallis*, 306 F.3d at 836-37.

The contract in this case has extremely similar characteristics. It reads:

> As to any cruise that does not begin, end or call at a port in the United States of America, we shall be entitled to any and all damages limitations, immunities and rights applicable to us under the "Convention Relating to the Carriage of Passengers and Their Luggage by Sea" of 1976 ("Athens Convention") which limits our liability for death of or personal injury to a passenger to no more than 46,666 Special Drawing Rights (as defined therein), and all other limits for damage or loss to personal property.

(Travel Documents 29.) This language requires a passenger to undertake virtually the same tortured line of research that the Ninth Circuit found objectionable in *Wallis*. Both statements list—but do not define—Special Drawing Right and rely on the passenger to conduct outside research to discover what this term means. Both contracts require the passenger to consult an outside financial resource—one that exists neither in the Contract nor in the Athens Convention itself—to calculate the current value of a Special Drawing Right once the customer becomes aware that a Special Drawing Right is a unit of currency. Both contracts require that the passenger estimate what that rate might be at some as-of-yet-unknown date of judgment. Both contracts refer to the Athens Convention of 1976, and thus require an examination of both the original 1974 protocol and its amendments.

The only relevant difference between these two constructions is that the contract in this case specifically lists the number "46,666." This one alteration is not enough justify a finding that the limitation was reasonably communicated, especially given the obscure nature and confusing name of a "Special Drawing Right." While another Court in this district has found that mentioning the number "46,666" helps put passengers on notice that the Special Drawing Right is a monetary unit, *see Paul v. Holland America Line Inc.*, No. C05-2016-RSM (W.D. Wash. Nov. 6, 2006), this Court respectfully disagrees with its decision. *Paul* substantially relied on language from *Mills v. Renaissance Cruises, Inc.*, 1992 WL 471301, at *1 (N.D. Cal. 1992), an unpublished district court case that was written several years before

ORDER – 7

*Wallis*. The contractual language in *Mills* was substantially clearer than the instant contract. It read:

> The Carrier shall not be liable for any such. injury. except the negligence of the Carrier or its employees' action within the scope of their Employment, and if such negligence be proven, the Carrier's liability therefor shall not exceed the following limitations per Passenger in Special Drawing Rights (S.D.R.) as defined in the amendment of 1978 to the Athens Convention, article 9:
> Personal Injury or Death S.D.R. 46,666
> The first S.D.R. 13 to be borne by the Passenger according to the Athens Convention, article 8.[1]

*Id.* at The subsequent reference to "the first S.D.R. 13" and the more substantial discussion regarding negligence and liability limitations would be more likely to communicate to a passenger that a Special Drawing Right is a monetary unit. It is worth noting that *Mills* is cited approvingly by *Wallis* as one of fifteen cases, listed in a string citation, as a case in which "the nature and/or amount of the limitation in question was *explicitly stated in the contract.*" *Wallis*, 306 F.3d at 839. The specific citation to *Mills* contained the following parenthetical: "(provision explicitly limiting liability for personal injury or death to "S.D.R. 46,666)." *Id.* Nevertheless, given the substantial differences between *Mills* and the instant case, the substantial similarities between the language of *Wallis* and the language of the contract in this case, and the cursory treatment given to *Mills* in *Wallis*, this Court finds the addition of the number "46,666" insufficient to alter the fundamental result dictated by *Wallis* that this term was not reasonably communicated. Further, the fact that the name Special Drawing Right contains the term "right" rather than a reference to a word clearly designating a monetary unit such as "dollars," "cents," "accounts," or the like, makes it extremely unlikely that anyone hearing the term for the first time—even with the preceding number "46,666"—would understand that term as a monetary one. Accordingly, relying on the binding Ninth Circuit precedent in *Wallis*, this Court holds the level of legal and financial sophistication required to interpret the terms of this contract weighs against a finding that its terms were reasonably communicated.

---

[1] At the present time, only the Westlaw citation for this case is available to the Court. The Court is aware of the strange formatting and punctuation of the quoted contract language and has opted to leave the formatting as it is listed on Westlaw.

ORDER – 8

1    The second major extrinsic factor militating against a finding of reasonable communication in

2  *Wallis* was the contract's facial ambiguity as to whether the Athens Convention actually applied. The

3  *Wallis* contract contained language stating "[i]f the Athens Convention or such exemptions and

4  limitations are held not to apply for any reason . . . . " *Wallis*, 306 F.3d at 830. The appellate court held

5  that this hedging language provided a significant disincentive to study the ticket and become meaningfully

6  informed, and that this disincentive counted as an extrinsic factor against finding that the limitation had

7  been reasonably communicated. *Id.* at 837 (9th Cir. 2002).

8    Similar, though not identical, language appears in the contract in this case. After reciting the

9  limitation to "*any and all* damages limitations, immunities, and rights *applicable to*" the carrier under the

10  Athens Convention, the contract states:

11       *[O]therwise*, this contract and its interpretation shall, to the maximum extent allowed
         under the general maritime law of the United States, be governed by and construed in
12       accordance with the general maritime law of the United States, *to the extent such
         maritime law is not applicable*, it shall be governed by and construed in accordance with
13       the laws of the State of Washington (U.S.A.).

14   (Contract ¶A.14 (emphasis added).) As in *Wallis*, it is not facially apparent whether or not these

15  limitations are definitely "applicable to" the carrier, or those which only hypothetically may be available to

16  the carrier in the event that the Athens Convention applies.[2] Further, it is hard to read the word

17  "otherwise" as anything but an indication that the Athens Convention might not apply. References to the

18  conditional application of federal maritime and Washington State law may further add to the confusion as

19  to whether the Athens Convention Applies, and provide yet another disincentive for the passenger to

20  research the contours of whatever limits the Athens Convention, with its 46,666 Special Drawing Rights,

21  _____

22       [2] While this Court takes no position on whether this language would be sufficiently precise to
     successfully incorporate the Athens Convention into the agreement as a matter of contract law between
23   parties in typical contract situations, the "reasonably communicated" inquiry before the Court involves a
     more "subjective" inquiry into the circumstances surrounding typical passengers. *Wallis* 306 F.3d at 836.
24   Thus the Court is not saying that the limits of the Athens Convention can never be incorporated into a
     passenger contracts where, as here, the two relevant nations are not signatories to the Convention.
25   Rather, the Court merely insists that the carrier reasonably communicate the limitations contained in the
     Athens Convention to the passenger if it wants the passenger to be bound by those terms.
26   ORDER – 9

1    may impose.

2           Accordingly, because the same two primary factors identified in the second prong of the

3    "reasonably communicated" analysis outlined in *Walls* exist here, the Court likewise finds that the

4    contract fails this second prong.

5                                              * * *

6           Having found that the contract fails both prongs of the reasonably communicated analysis, the

7    liability limitation to 46,666 Special Drawing Rights was not reasonably communicated and is thus

8    unenforceable.[3]

9    **III.    CONCLUSION**

10   For the foregoing reasons, Defendants' Motion for Partial Summary Judgment is DENIED.

11          SO ORDERED this 27th day of March, 2007

12

13

14

15                                             John C. Coughenour
                                               United States District Judge
16

17

18

19

20

21

22

23   _____

24          [3] Because the Court finds that the liability limitation is unenforceable under the reasonable
     communicativeness test, the Court need not address Plaintiff's argument under *Carnival Cruise Lines,*
25   *Inc. v. Shute*, 499 U.S. 585, 595 (1991), that the limitation itself is inherently unfair because Plaintiff did
     not receive the hardcopy ticket until after it was too late to obtain a refund.
26   ORDER – 10